UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

Shari L. Fisher,

                    Plaintiff,                         Court File No. 12-cv-1933 (JNE/LIB)

        v.                                             **REPORT AND RECOMMENDATION**

Carolyn W. Colvin,

                    Defendant.

_____

Plaintiff, Shari L. Fisher, seeks judicial review of the decision of the Commissioner of Social Security ("Defendant") denying her application for supplemental security income (SSI) and disability insurance benefits (DIB). The matter was referred to the undersigned United States Magistrate Judge for report and recommendation, pursuant to 28 U.S.C. § 636 and Local Rule 72.1. The Court has jurisdiction over the claims pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Both parties submitted cross-motions for summary judgment, [Docket Nos. 10, 20], and the Court took the matter under advisement on the written submissions.  For reasons discussed below, the Court recommends that Plaintiff's Motion for Summary Judgment, [Docket No. 10], be **GRANTED in part** and **DENIED in part**, and that Defendant's Motion for Summary Judgment, [Docket No. 20], be **GRANTED in part** and **DENIED in part**.

I.      STATEMENT OF FACTS

        A.      Procedural History

        In August 2009, Plaintiff filed applications for supplemental security income (SSI) and disability insurance benefits (DIB), alleging disability beginning March 17, 2008, due to a herniated disc; spondylolisthesis; spinal stenosis; hepatitis C; high blood pressure; herniated disc

surgery; and failed spinal lumbar surgery.[1] (Tr. 12, 91, 155-156, 170).[2] The Commissioner denied the claims on September 28, 2009. (Tr. 12, 103-105). Plaintiff filed a request for reconsideration, and on December 1, 2009, the Commissioner affirmed the earlier decision to deny the claims. (Tr. 12, 110-112). Pursuant to Plaintiff's subsequent December 7, 2009, Request for Hearing by Administrative Law Judge (ALJ), ALJ Mary M. Kunz conducted a hearing on February 4, 2011. (Tr. 12). On February 22, 2011, the ALJ issued a decision denying Plaintiff's request for benefits. (Tr. 9-11). The ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 9-11). Plaintiff sought review of the ALJ's decision with the Appeals Council. (Tr. 6-8, 222-226). However, on June 4, 2012, the Appeals Council denied review. (Tr. 1-5). As a result, the ALJ's decision became the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481. Thereafter, on August 7, 2012, Plaintiff filed the present action. (Compl. [Docket No. 1]).

**B.     Factual History**

Plaintiff is a 51-year-old woman who was 46 years old on the date of the alleged disability onset. (Tr. 23). Plaintiff has a ninth grade education and is able to communicate in English. (Tr. 23). Plaintiff's past relevant work was as a visual inspector and senior supervisor. (Tr. 23).

In applying for benefits, Plaintiff stated that she was "[u]nable to sit or stand for a definite amount of time (30 min[utes] max[imum])." (Tr. 171). Plaintiff stated that she is unable to lift more than ten pounds and experiences numbness in her left leg from knee to foot. (Tr. 171). Plaintiff stated that she is able to walk up to 30 minutes per day. (Tr. 171). Plaintiff stated

---

[1] Defendant notes in its Memorandum in Support of Summary Judgment that it appears the notices from Plaintiff's SSI claim are not part of the certified administrative record. However, Plaintiff makes no argument with respect to this omission, and the Defendant concedes that Plaintiff filed for both SSI and DIB.
[2] Throughout this Report and Recommendation, the Court refers to the Administrative Record, [Docket No. 7], by the abbreviation "Tr."

that she takes three pain pills per day and receives epidurals every two to three months for pain. (Tr. 171). Finally, she stated that she does not sleep well due to pain. (Tr. 171).

At the administrative hearing, Plaintiff testified that the "number one reason" why she is allegedly unable to work is her back pain. (Tr. 65). She testified that she is able to sit for only 15-20 minutes at one time and stand for up to 20 minutes at a time. (Tr. 65). She testified that she is able to walk for 25 minutes, lift up to eight pounds, and is unable to bend forward. (Tr. 65-67). She testified that she often has trouble concentrating. (Tr. 68). Plaintiff testified that she is able to do laundry, go grocery shopping, care for her grandchildren, and perform household chores. (Tr. 71-74).

### C. Medical Evidence in the Record

Plaintiff alleges that she became disabled on March 17, 2008, as a result of a failed back surgery, neck surgery, obesity, fibromyalgia, pain disorder, degenerative changes of the knees, left leg and ankle pain and numbness, and depression. (Pl.'s Mem. [Docket No. 11], at 2).

In the run-up to Plaintiff's April 4, 2008 back surgery, on March 7, 2008, an MRI of Plaintiff's lumbar spine revealed anterolisthesis on L4 and L5 without associated unilateral left pars defect, degenerative disc disease primarily at L4-L5 with mild central canal narrowing, and severe left foraminal stenosis at L4-L5 with likely exiting nerve root impingement and lesser right foraminal stenosis at L4-L5 without nerve root impingement. (Tr. 238, 252). On March 31, 2008, an examination by Dr. Paul Crowe of Northwest Orthopedic Surgeons revealed tenderness at L4-L5 and L5-S1. (Tr. 284). MRI film revealed a herniated disc with spondylolisthesis at L5-S1, and x-rays taken in the office showed significant spondylolisthesis at L4-L5. (Tr. 284). As a result, Dr. Crowe scheduled surgery for Plaintiff for April 4, 2008. (Tr. 284). Dr. Crowe

performed a decompression, L4-L5, with hemifacetectomy, L4-L5, and fusion, L4-L5, with pedicle screw implementation and autograft. (Tr. 243-244).

In a follow-up visit with Dr. Crowe on May 13, 2008, Plaintiff had made little post-operative progress, and she reported difficulty in managing a shower or stairs independently; Dr. Crowe ordered physical therapy. (Tr. 281). On May 27, 2008, Licensed Physical Therapist Michael Radtke evaluated Plaintiff. Physical exam revealed flat back, guarded/stiff posture, abnormal gait with left leg externally rotated, and swelling, with notable limitations in Plaintiff's lumbar spine flexion, extension, and bilateral side bending. (Tr. 309). On June 11, 2008, LPT Radtke again evaluated Plaintiff, noting that her pain level was better. (Tr. 308).

On referral from Dr. Crowe, Plaintiff presented at the North Memorial Interventional Pain Center where Dr. James Anderson evaluated Plaintiff on September 4, 2008. (Tr. 266). Plaintiff presented with lower back pain that radiated to the left lower extremity. (Tr. 266). Plaintiff's chief complaint was "I have pain in my back and leg," and she described the pain as sharp, stabbing, burning, pressure-like, and burning with radiation into the left foot. (Tr. 266). Dr. Anderson diagnosed Plaintiff with low back pain with a history of spinal fusion, and he administered an epidural steroid injection at L5-S1. (Tr. 267, 269).

However, on September 15, 2008, Dr. Crowe noted that despite treatment at the Pain Center, physical therapy, and medications for her back pain, "nothing seems to have helped." (Tr. 278). Dr. Crowe opined that Plaintiff's April 4, 2008, surgery had failed. (Tr. 278).

On October 16, 2008, Plaintiff returned to the Pain Center and reported that the epidural injections were somewhat helpful, that she felt she was more active, and that Methadone "took the edge off." (Tr. 264). Plaintiff was diagnosed with low back pain and radicular symptoms. (Tr. 264). Plaintiff received an epidural injection and the Pain Center refilled her Methadone

prescription and prescribed Zanaflex. (Tr. 262, 264). On November 13, 2008, Plaintiff received a lumbar facet joint injection at L5-S1 at the Pain Center in an attempt to decrease Plaintiff's back pain. (Tr. 258).

On December 1, 2008, Dr. Youmans of Camden Physicians examined Plaintiff, diagnosed her with chronic low back pain, and prescribed Zoloft for depression. (Tr. 247).

Plaintiff returned to Dr. Crowe on December 22, 2008, and Dr. Crowe noted that Plaintiff "was a failed spinal fusion from last April" and was still experiencing back pain with left leg numbness. (Tr. 277).

On February 4, 2009, Plaintiff returned to the Pain Center and again presented with low back pain. (Tr. 340). Plaintiff stated that 5 mg of Methadone three times a day was "helpful in controlling her pain." (Tr. 340). Plaintiff was diagnosed with low back pain with radicular symptoms. (Tr. 340).

Plaintiff received another epidural injection on March 4, 2009, at the Pain Center, after reporting a flare of pain that month with radiating pain down the back of her leg, the front of her leg, and into the top of her foot. (Tr. 381, 383). On April 3, 2009, Plaintiff reported that she was "doing well on the Methadone," and that she continued to be active around the house. (Tr. 354).

On April 14, 2009, Plaintiff was discharged from physical therapy after 17 sessions. Examination on discharge revealed a limited range of motion in her trunk, high left iliac crest, poor lumbar mobility, slow/guarded walking, abnormal posture, decreased lower extremity strength, and poor abdominal strength. (Tr. 372). However, records indicate that Plaintiff had made many gains in physical therapy, specifically with respect to walking tolerance, activity tolerance, strength, and mobility. (Tr. 373). Licensed Physical Therapist Rachel Peterson noted that Plaintiff was motivated and progressed to advanced-level exercises, demonstrating improved

spine stabilization ability, increased posture awareness, and increased tolerance for resistance and repetitions with exercise program. (Tr. 373).

On April 22, 2009, Plaintiff saw Deborah Fisher, Licensed Clinical Psychologist, to provide treatment recommendations regarding an implantable device for treatment of chronic pain. (Tr. 376). Ms. Fisher noticed that Plaintiff's mood was depressed and her affect flat. (Tr. 378). Ms. Fisher opined that Plaintiff was suffering from pain disorder associated with both psychological factors and a general medical condition, low back pain, left leg pain, and numbness. (Tr. 378). Ms. Fisher recommended individual psychotherapy and a chronic pain program. (Tr. 378).

On May 1, 2009, Plaintiff received another epidural injection at L5-S1. (Tr. 352). On May 19, 2009, a lumbar myelogram CT showed a decompressive laminectomy and posterior fusion at L4-L5, partial bilateral facetectomy, and grade I anterior spondylolisthesis of L4-L5. (Tr. 327). In evaluating the myelogram, Dr. Crowe observed, "It shows nice position of the bone screw with nice decompression." (Tr. 336).

Plaintiff again presented at the Pain Center on June 1, 2009, for evaluation of her low back pain. (Tr. 330). Examination by Patricia Tomshine, R.N., D.N.P., C.N.P., in coordination with Dr. Anderson, revealed slow movement sitting to standing, and tenderness at left L5. Plaintiff indicated that the pain responds to Methadone and Lyrica and that both medications had been helpful. (Tr. 330). Plaintiff was again diagnosed with low back pain and radicular symptoms. (Tr. 330).

Plaintiff returned to Dr. Crowe the following day. Dr. Crowe ordered an EMG, and the results were normal. (Tr. 325, 336). On June 15, 2009, Dr. Crowe reaffirmed that Plaintiff

suffered from failed back surgery syndrome, and that "[t]here is nothing to be done for it." (Tr. 335).

On June 17, 2009, Plaintiff returned to Ms. Fisher, Licensed Clinical Psychologist, for pain and anxiety. (Tr. 574). Ms. Fisher diagnosed Plaintiff with pain disorder, low back pain, and left leg numbness. (Tr. 575).

Plaintiff returned to the Pain Center on June 29, 2009, reporting that her pain was adequately controlled, via epidural injections, Methadone, and Lyrica. (Tr. 366). Plaintiff reported that she was active at home and in her yard. (Tr. 348). Examination indicated that Plaintiff moved easily from chair to standing position, her spine was midline, and she exhibited a good range of motion in her extremities with a normal gait. (Tr. 419). On August 27, 2009, Plaintiff again confirmed that medication – Methadone, Vistaril, and Lyrica – adequately controlled her pain. (Tr. 415).

On October 23, 2009, Plaintiff's pain, which had been radiating from her low back to her left leg, began radiating into her right lower back. (Tr. 411). However, Plaintiff was active at home, doing housework, woodcrafts, and caring for a grandson. (Tr. 411).

On October 30, 2009, Plaintiff presented at Northwest Orthopedic Surgeons. X-rays were normal and indicated no new instability. Plaintiff was instructed to follow-up with the Pain Center to see if any adjustments in her medications should be made. (Tr. 453).

On November 20, 2009, Plaintiff experienced pain down both of her legs, and an MRI revealed a small bulging disc with mild narrowing of the nerve at right L4-L5. (Tr. 470). Plaintiff received an epidural injection at L4-L5. (Tr. 500). However, in late December 2009, a subsequent epidural injection relieved Plaintiff's pain only slightly.

On December 14, 2009, Dr. Crowe recommended that Plaintiff only go to the Pain Center noting: "I don't think further surgical interventions or direct interventions are going to be useful to her. I think she is a chronic pain patient and I don't feel there is a resolution for her." (Tr. 468).

Plaintiff returned to the Pain Center on February 19, 2010, and a physical exam prompted an epidural injection at L4-L5. (Tr. 494). Plaintiff continued to experience low back pain with radicular symptoms and sleep issues into March 2010. (Tr. 490). Plaintiff returned to the Pain Center on April 19, 2010, experiencing back pain radiating into both legs. Her daily life was sedentary. (Tr. 518).

On May 19, 2010, Plaintiff reported that her pain was less adequately controlled by epidural injections and medications. Her pain had increased significantly when her Methadone dose was decreased (for insurance reasons), and physical activity had become nearly impossible due to pain. (Tr. 516). Plaintiff's Methadone dose was increased and she was referred to physical therapy. (Tr. 517).

Psychologically, Plaintiff continued to experience depression with a loss of energy, anxiety, sleep disturbance, and persistent worry, among other symptoms. (Tr. 507). Diagnoses at this time included pain disorder with accompanying psychological factors, low back pain, and left leg numbness. (Tr. 561).

Plaintiff returned to physical therapy on July 14, 2010, and, while at the Pain Center on July 16, 2010, she initially reported that she was very excited to return to it. (Tr. 512). Physical examination revealed decreased range of motion in the trunk, high left iliac crest, poor lumbar mobility, slow/guarded movement, abnormal posture, decreased lower extremity strength, and

poor abdominal strength. However, Plaintiff did not return for a follow-up and was discharged from physical therapy on September 13, 2010. (Tr. 539).

At her July 16, 2010, examination at the Pain Center, Plaintiff reported that she actively "felt good," that she tried to do a little more each day in terms of activity, and she stated that she believed the Effexor prescribed by her primary care provider was helping with her depression. (Tr. 512).

Plaintiff recommenced physical therapy on September 21, 2010, participating in psychical therapy sessions on 9/28/10 (Tr. 536), 10/5/10 (Tr. 535), 10/26/10 (Tr. 534), 11/2/10 (Tr. 533), 11/9/10 (Tr. 532), and 11/23/10 (Tr. 531).

On October 28, 2010, Plaintiff returned to Dr. Youmans, who determined that Plaintiff's depression symptoms were better and her back pain was the same. (Tr. 522).

Plaintiff continued to complain of back pain well into December 2010. Finally, on February 27, 2012, Dr. Crowe examined Plaintiff to evaluate increasing back pain. Plaintiff complained of pain in both hips/legs, left leg numbness, and she walked leaning forward. (Tr. 588). X-rays were normal; Plaintiff was given a cane, and Dr. Crowe opined: "There is nothing else to do for her." (Tr. 588). On March 5, 2012, an MRI of Plaintiff's lumbar spine showed degenerative disc changes at L4-L5 with mild narrowing of the mid-portion of the foramina. (Tr. 587).

### D.    Hearing Testimony and Statements

At the administrative hearing, a vocational expert (VE) provided expert opinions regarding a hypothetical 48-year-old individual with a ninth grade education with limitations and

restrictions matching those of Plaintiff.[3] (Tr. 84). The ALJ prefaced her questions as follows:

> I'm going then ask you some hypothetical questions and I want you to assume for the purposes of these questions we have an individual who is presently 48 years of age, so a younger individual, with a 9th grade limited education, and work experience as indicated in your report. And the claimant is limited by a number of conditions including what has been diagnosed as a pain disorder with psychological factors and general medical condition, depression, history of Hepatitis C, obesity, and a past lumbar fusion and remote history of cervical fusion. Because of the impairments in the first hypothetical question, I want you to assume that this individual would be exertionally limited to light work, lifting up to 20 pounds occasionally, 10 pounds frequently; six hours of standing or walking, two hours of sitting in an eight-hour workday; that would be further restricted by no more than occasional bending, twisting, stooping, kneeling, crouching, crawling, or climbing; and the work should provide for a brief change of position after 30 minutes. Given those limitations, first of all, could this individual perform any of the jobs done by the claimant in the past?

(Tr. 84-85).

The VE testified that the hypothetical individual, if limited to routine, repetitive, simple work, would not be able to perform Plaintiff's past jobs. (Tr. 85). However, the VE testified that the individual <u>would</u> be able to perform other jobs in the national economy that would accommodate those limitations: bottle packer (1,300 jobs in Minnesota), hand packer (2,300 jobs in Minnesota), and stuffer (3,000 jobs in Minnesota). (Tr. 85). The VE testified, however, that should the individual need to lie down for periods of 20 minutes to an hour at least twice during the workday, that such a limitation would not be consistent with the jobs he identified. (Tr. 86).

However, in her decision, the ALJ notes that the VE's testimony was inconsistent with the information contained in the Dictionary of Occupational Titles. (Tr. 24). Although the ALJ does not elaborate on precisely what the inconsistency is, she explains the inconsistency as

---

[3] The vocational expert was told that the individual is limited by a number of conditions, "including what has been diagnosed as a pain disorder with psychological factors and general medical condition, depression, history of Hepatitis C, obesity, and a past lumbar fusion and remote history of cervical fusion." (Tr. 84).

reasonably based on the VE's "extensive experience studying jobs in the region and placing individuals in jobs similar to those considered here," and accordingly seems to dismiss the inconsistency as harmless. (Tr. 24).

E.     The ALJ's Decision

On February 4, 2011, the ALJ held a hearing concerning Plaintiff's claim for a period of disability, disability insurance benefits, and supplemental security income. (Tr. 12). The ALJ held that Plaintiff has not been disabled within the meaning of the Social Security Act from March 17, 2008, through the date of the decision, February 22, 2011. (Tr. 12). In reaching her decision, the ALJ purported to apply the required five-step sequential analysis: (1) whether the claimant had engaged in substantial gainful activity; (2) whether the claimant had a severe impairment; (3) whether the claimant's impairment met or equaled a listed impairment; (4) whether the claimant had sufficient residual functional capacity to return to her past work; and (5) whether the claimant could do other work existing in significant numbers in the regional or national economy. (Tr. 13-14); 20 C.F.R. §§ 404.1520(a)-(f), 416.920.

At step one of the analysis, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since March 17, 2008, the alleged onset date. (Tr. 14); 20 C.F.R. §§ 404.1571 et seq., 416.971 et seq.

At step two, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine with history of L4-L5 fusion, remote history of cervical fusion, obesity, fibromyalgia, pain disorder, and depression. (Tr. 14); 20 C.F.R. §§ 404.1520(c), 416.920(c). Because the ALJ noted no evidence of any ongoing limitations regarding Plaintiff's degenerative changes in her right knee, the ALJ determined that this was a non-severe impairment under the regulations, not resulting in more than minimal restrictions on

Plaintiff's ability to perform basic work activities. (Tr. 15). Additionally, although Plaintiff has complained of left leg and ankle pain and numbness, electrical and nerve studies have been unremarkable, and, as a result, the ALJ held that these constitute non-medically determinable impairments under the regulations, "as there are no associated diagnoses by an acceptable medical source or objective medical testing to support such a diagnosis." (Tr. 15).

At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, subpart P, appendix 1. (Tr. 15). The ALJ determined that because the record is devoid of evidence that Plaintiff's back impairments resulted in compromise of a nerve root or the spinal cord with neuro-anatomic distribution of pain, limitation of motion of the spine, or motor loss with sensory or reflex loss, and because the record offers no evidence of lumbar spinal stenosis resulting in pseudolaudication establishing by findings and imaging, Plaintiff's back impairments do not meet the listing. (Tr. 15). Additionally, because Plaintiff's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, Plaintiff's mental impairments do not meet or medically equal the criteria of listing 12.04. (Tr. 15-16).

At step four, the ALJ determined that Plaintiff has the residual functional capacity (RFC) to perform light work as defined 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following specific limitations: Plaintiff is able to lift up to 20 pounds occasionally and 10 pounds frequently; she is able to sit, stand, and/or walk each up to 6 hours in an 8-hour workday; she is further restricted to no more than occasional bending, twisting, stooping, kneeling, crouching, crawling, or climbing; the work should provide for a brief change of position after thirty minutes; she is further limited to routine repetitive, simple work. (Tr. 17).

In making this RFC determination, the ALJ employed a two-step process. (Tr. 17). First, the ALJ asked whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. (Tr. 17). Second, if an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms was shown, the ALJ evaluated the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limited the claimant's ability to work. (Tr. 17). The ALJ made a finding on the credibility of Plaintiff's statements about the limiting effects of her impairments by considering the record as a whole. (Tr. 17). Furthermore, in making her determination, the ALJ considered all Plaintiff's alleged symptoms and whether they were consistent with the objective medical evidence and other evidence consistent with 20 C.F.R. §§ 404.1529 and 416.929, (Tr. 14), and also considered opinion evidence in accordance with 20 C.F.R. § 404.1527. (Tr. 17).

Starting with the first prong of step four, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. 18). However, at the second prong, the ALJ determined the claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the RFC assessment. (Tr. 18). The ALJ noted that Plaintiff's allegations of disability due to her impairments were not credible for "a variety of reasons." (Tr. 20). First, the ALJ observed that the weight of the objective medical record does not corroborate the level of limitation Plaintiff alleges due to her impairments:

> The claimant did undergo surgery for her back impairment, which certainly suggests that the symptoms were genuine. While that fact would normally weigh in the claimant's favor, it is offset by the fact that the record reflects that the surgery was generally successful in relieving the symptoms. Although Dr. Crowe deemed the claimant's fusion surgery a failure, the records indicate that her

> function on examinations thereafter was relatively normal as far as
> functioning in work-related activities. The MRI findings indicate
> that the claimant's fusion was solid, and remaining findings were
> characterized as mild with no significant narrowing.

(Tr. 20). Generally, the ALJ determined that the record revealed that treatment has been generally successful in controlling Plaintiff's allegedly disabling symptoms. (Tr. 20).

Although the ALJ determined that Plaintiff is able to perform light work, the ALJ determined that Plaintiff is unable to perform any past relevant work. (Tr. 23). The ALJ relied on the testimony of the vocational expert (VE), who testified that a hypothetical individual with the residual functional capacity of Plaintiff would be unable to perform Plaintiff's past relevant work as a visual inspector and senior supervisor. (Tr. 23).

At step five of the analysis, the ALJ determined that, considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff is able to perform. (Tr. 24). The ALJ again relied on the VE, who testified that a hypothetical individual with Plaintiff's limitations (described above) would be able to perform the requirements of representative occupations such as bottle packer (1,300 jobs in Minnesota), hand packager (2,300 jobs in Minnesota), and stuffer (3,000 jobs in Minnesota). (Tr. 24). Because Plaintiff is able to perform jobs that exist in significant numbers in the national economy, the ALJ concluded that Plaintiff is not disabled as defined by the Social Security Act. (Tr. 25).

## II.  STANDARD OF REVIEW

Congress imposed standards for determining whether a claimant is entitled to Social Security disability benefits. There are several benefits programs under the Act, including the DIB Program of Title II (42 U.S.C. §§ 401 et seq.) and the SSI Program of Title XVI (42 U.S.C. §§ 1381 et seq.). "Disability" means "the inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be eligible for benefits, an individual's impairments must be of "such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Judicial review of the Commissioner's decision to deny disability benefits is constrained to a determination of whether the decision is supported by substantial evidence in the record as a whole. Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005). Substantial evidence means more than a scintilla, but less than a preponderance. Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009). The substantial evidence test requires "more than a mere search of the record for evidence supporting the [Commissioner's] findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (alterations in original) (quoting Gavin v. Heckler, 811 F.2d 1195 1199 (8th Cir. 1987)). Rather, the court "must take into account whatever in the record fairly detracts from its weight." Id. (quoting Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 488 (1951)).

When reviewing the record for substantial evidence, the court may not reverse the Commissioner's decision simply because substantial evidence exists to support the opposite conclusion. Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984). Moreover, the Court may not substitute its own judgment or findings of fact for those of the ALJ. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989). After balancing the evidence, if it is possible to reach two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision,

the court must affirm the decision. <u>Robinson v. Sullivan</u>, 956 F.2d 836, 838 (8th Cir. 1992). Thus, the court will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" <u>Bradley v. Astrue</u>, 528 F.3d 1113, 1115 (8th Cir. 2008). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." <u>Id.</u>

## III.   DISCUSSION

Plaintiff challenges that the ALJ's decision as not supported by substantial evidence, nor based upon correct legal standards, for four reasons:

1. The ALJ erred in failing to give controlling or great weight to the treating and examining physician's opinions.

2. The AJL erred in relying on the opinions of the non-examining, non-treating state agency medical physicians.

3. The ALJ erred in failing to properly assess Plaintiff's obesity pursuant to SSR 02-1p.

4. The ALJ failed to sustain the Commissioner's burden at step five.

(Pl.'s Mem. [Docket No. 11]).

### A.   Whether the ALJ Erred in Failing to Give Controlling or Great Weight to the Treating Physician's Opinion

The ALJ determined that she was unable to give several of Dr. Crowe's, one of Plaintiff's treating physicians, espoused opinions controlling or great weight. First, the ALJ was unable to give controlling weight to several of Dr. Crowe's determinations that Plaintiff was (1) unable to return to work, and, eventually, (2) permanently disabled:

> Dr. Crowe limited the claimant's ability to work at various times throughout 2008. He indicated she was unable to work permanently as of December 2008. The undersigned is unable to give this opinion great weight, as the issue of whether an

individual is capable of work activity is reserved for the
Commissioner (SSR 96-5p).

(Tr. 22). Dr. Crowe determined that Plaintiff was unable to return to work on 5/13/2008,

6/16/2008, 7/21/2008, and 9/15/2008; and noted that Plaintiff was "permanently disabled" on

12/22/2008, 6/2/2009, and 6/15/2009. (Tr. 311, 312, 313, 314, 315, 332, 333).

Additionally, the ALJ gave less than controlling weight to (1) Dr. Crowe's August 2009

medical source statement (Tr. 396-398), (2) a Guardian (Long Term Disability Plan) form Dr.

Crowe filled-out with regards to Plaintiff in February 2010 (Tr. 464-467), and (3) a short letter

written on November 22, 2010, regarding Plaintiff (Tr. 526). The ALJ cites several reasons for

her weight determinations. First, the ALJ notes that Dr. Crowe had not examined Plaintiff since

November 2009, at which time he noted a "fairly unremarkable examination." (Tr. 23). As a

result, it appears as though Dr. Crowe relied heavily (if not exclusively) on Plaintiff's subjective

reports and "seemed to uncritically accept as true most, if not all, of what the claimant reported."

(Tr. 23). Additionally, the ALJ notes that there is no indication that Dr. Crowe saw or was aware

of the records from the Pain Center reporting Plaintiff's ability to control her pain and her

increased activity. (Tr. 23). The ALJ determined that these opinions by Dr. Crowe were

ultimately inconsistent with substantial evidence in the record.

Plaintiff argues that the ALJ did not give sufficient weight to these opinions. First,

Plaintiff argues that Plaintiff's subjective complaints are an essential diagnostic tool not to be

immediately discounted. Second, Dr. Crowe is "intimately familiar with Plaintiff's condition,

having treated her for a long period of time . . .," and the ALJ failed to give good reason for

discounting Dr. Crowe's opinions. (Pl.'s Mem. [Docket No. 11], at 18-19).

"[A] treating physician's opinion is given 'controlling weight' if it 'is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence.'" <u>Dolph v. Barnhart</u>, 308 F.3d 876, 878 (8th Cir. 2002). However, a treating physician's opinion "do[es] not automatically control, since the record must be evaluated as a whole." <u>Bentley v. Shalala</u>, 52 F.3d 784, 786 (8th Cir. 1995). An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the record as a whole. <u>See</u> <u>Rogers v. Chater</u>, 118 F.3d 600, 602 (8th Cir. 1997); <u>Ghant v. Bowen</u>, 930 F.2d 633, 639 (8th Cir. 1991). The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence. <u>See</u> <u>Wagner v. Astrue</u>, 499 F.3d 842, 849 (8th Cir. 2007); <u>Ward v. Heckler</u>, 786 F.2d 844, 846 (8th Cir. 1986). In other words, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise. <u>Id.</u>

A treating physician's opinion "on the issue(s) of the nature and severity" of an impairment is given controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and <u>is not inconsistent with the other substantial evidence</u>" in the case. 20 C.F.R. § 404.1527(c)(2) (emphasis added). On the other hand, certain decisions are legal questions reserved to the Commissioner:

> (d) Medical source opinions on issues reserved to the Commissioner. Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.
>
> (1) Opinions that you are disabled. We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical

source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

(2) Other opinions on issues reserved to the Commissioner. We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§ 404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

(3) We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section.

20 C.F.R. § 404.1527(d). Consequently, a non-medical opinion, such as a treating physician's opinion whether a patient is disabled, or whether the patient meets the requirements of an impairment in the listings, must be considered but is not given controlling weight. 20 C.F.R. § 404.1527(d)(1)-(2); Kemnitz v. Astrue, No. 12-cv-285 (SRN/LIB), 2013 WL 791789 (D. Minn. Feb. 1, 2013), report and recommendation adopted, 12-cv-285 (SRN/LIB), 2013 WL 791840 (D. Minn. Mar. 4, 2013).

First, with regard to Dr. Crowe's determinations that Plaintiff was unable to work and permanently disabled beginning in December 2008, the regulations allow the ALJ to discount such "ultimate issue" opinions as reserved for the ALJ. The ALJ is responsible for determining whether a claimant is disabled and whether a claimant is able to work and in what capacity. As a result, the regulations allowed the ALJ to refrain from giving these opinions by Dr. Crowe any "special significance" or controlling weight otherwise potentially available to treating physician opinions. "[T]reating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p. "[O]pinions that a claimant is

19

"disabled" or "unable to work" concern issues reserved to the Commissioner and are not the type of opinions which receive controlling weight. Vossen v. Astrue, 612 F.3d 1011, 1015 (8th Cir. 2010) (citing Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); see also SSR 96-5p (July 2, 1996) (giving such opinions controlling weight would "in effect, confer upon the treating source the authority to make" disability determinations)).

Second, with regard to Dr. Crowe's opinions in August 2009, February 2010, and November 2010, the ALJ may discount the opinions of a treating physician when the ALJ's determination is justified by substantial evidence in the record as a whole. See Rogers, 118 F.3d at 602; Ghant, 930 F.2d at 639. Reading the record as a whole, there is substantial evidence that supports the ALJ's determination that Dr. Crowe's opinions in these instances were generally contrary to the record as a whole.

In his August 2009 medical source statement, Dr. Crowe opined that Plaintiff was severely limited. He opined that Plaintiff was only able to occasionally lift 10 pounds, that she was only able to sit continuously for 2 hours during the course of an 8-hour work day, only able to stand continuously for 2 hours over the course of an 8-hour work day, entirely unable to use her feet in operating leg controls, only able to occasionally perform simple motor functions (such as grasping, pushing, pulling, handling, etc.), and ultimately permanently disabled. (Tr. 396-398). In February 2010, Dr. Crowe noted that Plaintiff's physical limitations were "class 5" severe limitations of functional capacity, and that she was ultimately incapable of minimal (sedentary) activity. (Tr. 465). Finally, in November 2010, Dr. Crowe wrote a short, single-paragraph letter stating that Plaintiff is unable to return to the work force in any capacity due to the amount of pain she continues to have. (Tr. 526).

The Court finds that substantial evidence in the record is inconsistent with Dr. Crowe's opinions and supports the ALJ's discounting of these opinions. Generally speaking, Plaintiff's evaluations throughout 2008, 2009 and 2010 indicate that (1) she was able to control her pain, (2) many of her examinations were largely unremarkable and did not indicate that Plaintiff was as severely limited as Dr. Crowe opined, and (3) she experienced notable improvements along the way.

In 2008, Plaintiff was responding well to physical therapy after her April 4, 2008, surgery. (Tr. 308). Examinations at the Pain Center revealed that medication and epidural injections adequately controlled Plaintiff's pain, to the point that she reported feeling more active. (Tr. 264). Throughout this time period, Plaintiff reported that she continued to be active around her home and yard. (Tr. 354, 411). Significantly, Plaintiff's 17 physical therapy sessions produced measurable improvements and notable gains, specifically with regard to Plaintiff's walking tolerance, activity tolerance, strength, and mobility. (Tr. 373). Examinations indicated that Plaintiff moved easily from chair to standing position, her spine was midline, and she exhibited a good range of motion in her extremities with a normal gait. (Tr. 419). On August 27, 2009, Plaintiff again confirmed that medication – Methadone, Vistaril, and Lyrica – adequately controlled her pain. (Tr. 415). Pain Center evaluations continued to note Plaintiff's ability to easily transition from sitting to standing, her ability to move without trouble, and the absence of notable concerns with Plaintiff's extremities. (Tr. 411). Dr. Youmans observed a normal gait and the absence of major musculoskeletal abnormalities. (Tr. 356-360). X-rays and EMGs were normal. (Tr. 325, 453). In fact, in July 2010, Plaintiff affirmatively reported feeling good. (Tr. 512).

Dr. Crowe examined Plaintiff in November 2009. This examination was Dr. Crowe's last examination of Plaintiff prior to his February 2010 and November 2010 assessments of Plaintiff. Furthermore, this examination is most close-in-time to Dr. Crowe's August 2009 medical source statement (occurring three months after Dr. Crowe made those assessments). Plaintiff's November 2009 examination was largely unremarkable. (Tr. 469). The ALJ reasonably considered the November 2009 findings – and, indeed, all other findings within the medical record – in evaluating Dr. Crowe's opinions, as this examination would most accurately reflect Plaintiff's physical state at the time of the subject assessments.

The regulations allow that an ALJ may choose not to give controlling weight to a treating physician's opinion; however, she must explain her reasons for doing so:

> When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

20 C.F.R. § 404.1527(c)(2).

Because the ALJ identifies and describes substantial evidence in the record as a whole that supports her determinations and justifies her decision to refrain from giving controlling weight to some of Dr. Crowe's opinions, the Court concludes that the ALJ acted within the scope of her discretion by rejecting these opinions of Dr. Crowe. The ALJ's decision here was based on substantial evidence in the record.

### B.   Whether the ALJ Erred in Relying on the Opinions of the Non-Examining, Non-Treating State Agency Medical Physicians

The ALJ gave "some probative" weight to the opinions of the state agency consultants, namely, Dr. Salmi and Dr. Mark:

> The assessments of the state agency consultants have been considered in determining the claimant's residual functional capacity. The state agency consultants' opinions are generally consistent with the weight of the evidence as it is before the Commissioner at the hearing level. Further, the state agency consultants are familiar with the regulations under which disability determinations are made. Based on these factors, their opinions are given some probative weight in formulating the residual functional capacity.

(Tr. 22). Plaintiff argues that the opinions of non-treating, non-examining physicians are entitled to the least weight and do not constitute substantial evidence to support a denial of benefits. (Pl.'s Mem. [Docket No. 11], at 21 (citing 20 C.F.R. § 404.1527(d)(2), 416.927(d)(2))).

Where, as already discussed above, the treating doctor's opinion is not supported by the objective evidence, and the ALJ conducts an independent review of the record, the ALJ is entitled to rely upon the opinions of consulting physicians. McNelis v. Astrue, No. 11-cv-16 (SRN/LIB), 2012 WL 838408 (D. Minn. Feb. 3, 2012) report and recommendation adopted, No. 11-cv-16 (ADM/LIB), 2012 WL 837116 (D. Minn. Mar. 12, 2012); Thiele v. Astrue, 856 F. Supp. 2d 1034, 1047 (D. Minn. 2012) ("[I]f the ALJ did not rely solely on the nonexamining physician's opinion but also conducted an independent review of the medical evidence and other evidence, such as motivation to return to work and daily activities, then there is substantial evidence in the record to support the ALJ's RFC determination.")

In his Physical RFC Assessment, state agency consultant Dr. Gregory H. Salmi, M.D., opined that Plaintiff is able to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and push and/or pull an unlimited amount of time (other than as indicated for lift and/or carry). (Tr. 403). Dr. Salmi justifies his designations with reference to Plaintiff's herniated disc, spondylolisthesis, spinal stenosis, hepatitis C, and high blood pressure. (Tr. 403).

He cites knowledge of her April 4, 2008, back surgery, her steroid injections, and her prescribed Methadone and Lyrica. (Tr. 403). In particular, Dr. Salmi cites to Plaintiff's June 2009 exam, at which Plaintiff had no difficulty moving from a seated position to a standing position, and her gait and station were unremarkable. (Tr. 403). Dr. Salmi concluded that light RFC is reasonable. (Tr. 403). Dr. Salmi further indicated that Plaintiff is able to climb, stoop, kneel, crouch, and crawl occasionally, with no manipulative, visual, communicative, or environmental limitations. (Tr. 404-406). Dr. Aaron Mark subsequently reviewed Dr. Salmi's determinations and affirmed and deemed them complete. (Tr. 459-461).

Dr. Salmi's and Dr. Mark's opinions support the ALJ's own assessment that objective medical evidence in the record did not support finding that Plaintiff's chronic back pain and other ailments caused disabling limitations. Thus, the ALJ did not rely <u>solely</u> on consulting physicians to support her RFC analysis. The ALJ acted within the scope of her discretion by lending some probative weight to the state agency consultants' opinions and the ALJ's decision here was based on substantial evidence.

As discussed in the previous section, Plaintiff's evaluations throughout 2008, 2009 and 2010 indicate that she was able to control her pain, that many of her examinations were largely unremarkable and did not indicate that Plaintiff was as severely limited as Dr. Crowe opined, and that she experienced notable improvements along the way. For the same reasons that the ALJ had substantial evidence to discount several of Dr. Crowe's opinions, so does substantial evidence support the lending some probative weight to the findings by Drs. Salmi and Mark.[4]

---

[4] As articulated in the previous section, in 2008, Plaintiff was responding well to physical therapy after her April 4, 2008, surgery. (Tr. 308). Examinations at the Pain Center revealed that medication and epidural injections adequately controlled Plaintiff's pain, to the point that she reported feeling more active. (Tr. 264). Throughout this time period, Plaintiff reported that she continued to be active around her home and yard. (Tr. 354, 411). Significantly, Plaintiff's 17 physical therapy sessions produced measurable improvements and notable gains, specifically with regard to Plaintiff's walking tolerance, activity tolerance, strength, and mobility. (Tr. 373). Examinations indicated that Plaintiff moved easily from chair to standing position, her spine was midline, and she

**C.      Whether the ALJ Erred in Failing to Properly Assess Plaintiff's Obesity Pursuant to SSR 02-1p**

Plaintiff argues that the ALJ failed to adequately assess the effect obesity had on Plaintiff's ability to perform routine movement and physical activity within the work environment. Other than to mention obesity as a "severe" impairment, the ALJ did not assess whether obesity caused any limitations of function. Plaintiff argues that remand is required for consideration of obesity at steps three, four, and five of the sequential evaluation process. (Pl.'s Mem. [Docket No. 11], at 23).

SSR 02-1p provides:

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. As explained in SSR 96-8p ("Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims"), our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea.

Titles II & XVI: Evaluation of Obesity, SSR 02-1p (S.S.A. Sept. 12, 2002).

The ALJ reviewed the record as a whole, explicitly stated that at step four of the sequential analysis she considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, and

---

exhibited a good range of motion in her extremities with a normal gait. (Tr. 419). On August 27, 2009, Plaintiff again confirmed that medication – Methadone, Vistaril, and Lyrica – adequately controlled her pain. (Tr. 415). Pain Center evaluations continued to note Plaintiff's ability to easily transition from sitting to standing, her ability to move without trouble, and the absence of notable concerns with Plaintiff's extremities. (Tr. 411). Dr. Youmans observed a normal gait and the absence of major musculoskeletal abnormalities. (Tr. 356-360). X-rays and EMGs were normal. (Tr. 325, 453). In fact, in July 2010, Plaintiff affirmatively reported feeling good. (Tr. 512).

explicitly referenced Plaintiff's obesity in the decision. The Eighth Circuit has held that when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal. Brown ex rel. Williams v. Barnhart, 388 F.3d 1150, 1153 (8th Cir. 2004). In Brown, after his benefits were denied, the claimant argued on appeal that the ALJ failed to properly consider his obesity. Id. We affirmed the ALJ's denial of benefits because the "ALJ specifically referred to [the claimant's] obesity in evaluating his claim." Id.

Here, the ALJ made reference to Plaintiff's obesity. The record indicates that the ALJ specifically considered Plaintiff's obesity at step two of the sequential analysis. (Tr. 15; "The claimant is reportedly obese."). As a result, the record indicates that the ALJ considered Plaintiff's obesity when evaluating her claim. Because the ALJ specifically took Plaintiff's obesity into account in her evaluation, we will not reverse that decision. See Heino v. Astrue, 578 F.3d 873, 881-82 (8th Cir. 2009).

**D.      Whether the ALJ Sustained the Commissioner's Burden at Step Five**

Plaintiff argues that the ALJ failed to sustain its burden at step five of the sequential analysis, failing to establish that Plaintiff retains the residual functional capacity to do other kinds of work and that other work Plaintiff is able to do exists in the national economy. (Pl.'s Mem. [Docket No. 11], at 24). Plaintiff argues that (1) the ALJ erred in finding Plaintiff could perform the "light work" job of "stuffer," as that job is sedentary, (2) the ALJ erred in finding that Plaintiff, while requiring "a brief change in position every 30 minutes," is still able to perform light work, and (3) the ALJ erred in posing vague, insufficiently specific questions to the VE regarding the definition of "brief change in position." (Id.)

The Commissioner bears the burden at step five to provide substantial evidence that Plaintiff can perform the duties of the specified jobs. "The claimant carries the burden of

establishing that he is unable to perform his past relevant work, i.e., through step four, at which time the burden shifts to the Commissioner to establish that he maintains the residual functional capacity to perform a significant number of jobs within the national economy." Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001).

As an initial matter, the Court dismisses Plaintiff's argument regarding the VE's characterization of "stuffer" as light work, as opposed to sedentary, as irrelevant. The ALJ's decision included reference to two other "light" occupations described by the VE which Plaintiff could perform in the national economy. (Tr. 24, 85); see Clay v. Barnhart, 417 F.2d 922, 931 (8th Cir. 2005) (concluding that even if one job cited by the VE were inappropriate, substantial evidence supported the step five determination where the VE testified as to other jobs existing in significant numbers the plaintiff could perform).

Plaintiff next argues that the ALJ's reference to a "brief" change in position was insufficiently specific, necessarily precluding consideration of the VE's subsequent testimony. SSR 96-9p provides:

> **Alternate sitting and standing:** An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. **The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing.** It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

Titles II & XVI: Determining Capability to Do Other Work-Implications of A Residual Functional Capacity for Less Than A Full Range of Sedentary Work, SSR 96-9p (S.S.A July 2,

1996). The ALJ's hypothetical question to the VE, and thus the subsequent RFC assessment, specifically identifies the frequency of the individual's need to alternate sitting and standing as every 30 minutes. (Tr. 85).

The ALJ's hypothetical was not impermissibly vague nor in violation of SSR 96-9p. The ALJ articulated that the hypothetical individual required "brief changes in position" after 30 minutes. C.f. Maynard v. Astrue, 276 Fed. Appx. 726, 731 (10th Cir. 2007) (holding a hypothetical that included a general "sit-stand option" but provided "no specifics to the VE concerning the frequency of any need [the claimant] may have to alternating sitting and standing and the length of time needed to stand" did not comply with SSR 96-9p and, accordingly, the VE's response to such a question did not amount to substantial evidence of nondisability). A "brief change in position" effectively communications that Plaintiff's change would be swift and not require she leave her workstation. "Brief change in position" does not implicate long breaks but merely a "readjusting" over the course of one's 8-hour work day.

"Where, as here, a hypothetical question includes all impairments and limitations accepted as true by the ALJ, and is supported by substantial evidence in the record, it provides a proper basis for the ALJ to rely on the VE's response to the hypothetical question." Thiele v. Astrue, 856 F. Supp. 2d 1034, 1050 (D. Minn. 2012) (citing Pearsall, 274 F.3d at 1220 (8th Cir. 001).

Finally, as to Plaintiff's contention that requiring a "brief change in position" automatically and/or necessarily precludes one's ability to perform light work, this argument as a per se notion is inconsistent with Agency guidelines:

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit

for a time, but must then get up and stand or walk for a while before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)

There are some jobs in the national economy – typically professional and managerial ones – in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot **ordinarily** sit or stand at will. **In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base**.

Titles II & XVI: Capability to Do Other Work – Themedical – Vocational Rules As A Framework for Evaluating Exertional Limitations Within A Range of Work or Between Ranges of Work, 1983-1991 Soc. Sec. Rep. Serv. 36 (S.S.A 1983) (emphasis added).

At the administrative hearing, the VE testified that requiring a brief change of position at 30 minute intervals would not preclude Plaintiff from performing the light jobs of bottle packer and hand packager. (Tr. 85). "Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT." Policy Interpretation Ruling: Titles II & XVI: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions, SSR 00-4p (S.S.A Dec. 4, 2000). However, as noted above, the ALJ determined that the VE's testimony did conflict with DOT information. (Tr. 24). It follows, therefore, that there are instances in which conflict between VE testimony and the DOT may arise, at which time the ALJ must elicit a reasonable explanation for the

conflict before relying on the VE testimony as evidence to support a determination or decision about whether the claimant is disabled. Id. Reasonable explanations for such a conflict, which may provide a basis for relying on the evidence from the VE rather than the DOT information, include but are not limited to:

> Evidence from VEs or VSs can include information not listed in the DOT. The DOT contains information about most, but not all, occupations. The DOT's occupational definitions are the result of comprehensive studies of how similar jobs are performed in different workplaces. The term "occupation," as used in the DOT, refers to the collective description of those jobs. Each occupation represents numerous jobs. Information about a particular job's requirements or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a VE's or VS's experience in job placement or career counseling.
>
> The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE, VS, or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT.

Id.

At the hearing, however, the VE testified only generally that his opinion regarding Plaintiff's ability to do light work despite the requirement for brief changes in position was not inconsistent with the DOT definition of the jobs he provided. (Tr. 86). However, while the language in SSR 83-12 leaves some room for the possibility of light work jobs accommodating brief changes in position every 30 minutes, the VE's testimony at the hearing did not articulate in any specific way how his opinion fit into this narrow exception in order to avoid being inconsistent with DOT regulations, as Plaintiff contends and as the ALJ concluded.

Indeed, the ALJ determined that a brief change in position was inconsistent with the DOT definition of light work, (Tr. 24), but the ALJ then conclusorily determined that the VE must

have reconciled that discrepancy based on his "extensive experience studying jobs and placing individuals." (Tr. 24). The ALJ, in essence, substituted her own speculative explanation for how she resolved the conflict rather than requesting further specific, clarifying explanation from the VE. When the ALJ made the determination that a conflict existed between the VE testimony and DOT information, she was required to seek further explanation prior to relying on the testimony.

On this record, the Court cannot determine whether substantial evidence supports the ALJ's determination that reliance on the VE's "experience" alone constitutes a reasonable explanation for resolving the conflict the ALJ found existed between the VE testimony and DOT information. As a result, the Court recommends remanding this single, narrow issue to seek further evidence regarding the conflict between the VE's testimony and the DOT definitions, which the ALJ herself recognized existed concerning the Plaintiff's ability to perform light work.

## IV.    CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, the Court **HEREBY RECOMMENDS**:

1.   That Plaintiff's Motion for Summary Judgment, [Docket No. 10], be **GRANTED in part** and **DENIED in part** as set forth above; and

2.   That Defendant's Motion for Summary Judgment, [Docket No. 20], be **GRANTED in part** and **DENIED in part** as set forth above.


Dated: January 30, 2014                              s/Leo I. Brisbois
                                                     The Honorable Leo I. Brisbois
                                                     United States Magistrate Judge


### N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by February 13, 2014**, a writing that

specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections **by February 27, 2014**. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.